* * * * * * * * * * *
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner DeLuca. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner DeLuca with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between the named plaintiff and named defendant-employer.
3. Plaintiff's average weekly wage will be determined by a Form 22. Analysis of a Form 22 submitted after the second hearing yielded an average weekly wage of $595.35 and a compensation rate of $396.92.
4. The employee sustained an injury on or about January 30, 1999, with the exact date to be determined by the Industrial Commission.
5. The injury arose out of and in the course of employment and is compensable.
6. It is stipulated that Liberty Mutual made payment to Wilmington Orthopaedic Group for treatment of plaintiff's injuries.
7. It is stipulated that the carrier did not file an Industrial Commission Form 21, 60, or 63 in this claim.
8. It is stipulated that the carrier denied further medical treatment and any payment of temporary total disability benefits.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was born on March 11, 1968, and received a high school diploma. He began working with defendant-employer in 1998.
2. Plaintiff sustained an admittedly compensable injury on January 30, 1999 when he was struck on his hard hat near the temple by a 2x4 board, knocking him to the ground.
3. Following the incident, plaintiff was taken to Dr. Don Creed by his supervisor on January 30, 1999. He had complaints of left temporal pain, neck, and trapezius pain. Dr. Creed observed no bump, no abrasion, and no bruising on plaintiff's head. Dr. Creed reported plaintiff's statement that he had not lost consciousness. He was diagnosed with a contusion to the temporal area and cervical strain. He was provided prescriptions and told to return to the clinic. Dr. Creed did not specifically address work restrictions.
4. By February 1, 1999, plaintiff's pain had increased and he presented with complaints of numbness radiating into the hand in the first and second fingers, and low back pain. He was examined and diagnosed with neck and back pain. He was provided light duty restrictions.
5. Plaintiff is a member of a labor union and, per his union contract, was required to submit to a post-accident drug test. Plaintiff refused the drug test and, per the terms of his union contract, was declared ineligible for employment from February 1-5, 1999. This type of suspension was referred to as being "on the hill."
6. Upon his return to work, plaintiff was to work light duty. Defendant-employer requested that plaintiff carry lumber. When plaintiff refused to carry lumber and was instead sliding his lumber, plaintiff was written up for "failure to cooperate."
7. Plaintiff continued to relay his complaints of neck pain, headache pain, and back pain to Dr. Creed. Even so, Dr. Creed returned plaintiff to work full duty, effective February 24, 1999. Plaintiff returned to work and was again written up, this time for being at work in a "disoriented" state. A drug test revealed he was not under the influence of a controlled substance or intoxicant, but defendant-employer sent plaintiff home for ten days without pay.
8. Plaintiff continued to relay his complaints of pain to his defendant-employer. He went on his own to Dr. Schultz, a local chiropractor, on March 3, 1999. At that time, his evaluation revealed cervical and trapezius spasms, reversal of the normal cervical curve, and malposition of the second, fifth and sixth cervical discs. He was taken out of work through March 12, 1999, at which time he was to be re-evaluated.
9. On March 4, 1999, plaintiff had an appointment with Dr. Nance, an orthopaedist, as arranged by defendant-employer. Contrary to his statement to Dr. Creed, plaintiff claimed that he lost consciousness at the time of his injury. At this time, Dr. Nance was of the opinion that plaintiff was suffering from a cervical strain, contusion to the right hand, and strain to the right hip. He did not place any work restrictions on plaintiff at that time.
10. Plaintiff provided a copy of the "out of work" note he received from Dr. Schultz to defendant-employer. When he called later to inquire about returning to work, he was informed his employment had been terminated. The reason for the termination was failure to return to work after a full-duty release was authorized by his treating physician.
11. Plaintiff was only able to treat with Dr. Schultz through March 12, 1999, at which time he could not return as he had been fired and had no means to pay for treatment. Dr. Schultz testified he did not return plaintiff to work, and was to re-evaluate him for return to work, but plaintiff did not return. He was thus not able to render an opinion regarding disability after March 12, 1999, as he had not seen the patient since then.
12. Another appointment with Dr. Nance was authorized by defendants. On or about July 28, 1999, Dr. Nance found no orthopaedic cause for plaintiff's symptoms and felt a neurological work up for possible head injury would be appropriate. Dr. Nance did not give plaintiff any work restrictions in this visit.
13. Dr. David S. Bachman saw plaintiff on October 15, 1999 for a one-time evaluation. Dr. Bachman testified that plaintiff's medical records showed he had sustained a head injury but that plaintiff was not disabled. He recommended an x-ray of the right knee, lumbar spine, EMG, and nerve conduction studies. The tests were denied.
14. On January 6, 2003, plaintiff underwent a consultative examination by Dr. Chris Wood. He had continued complaints of right side pain, headaches, back pain, and memory loss. Plaintiff reported the onset of these problems when a 2x4 board at work struck him in January 1999. The pain radiated from his head to his right arm and was chronic in nature. The examination revealed loss of range of motion. Dr. Wood recommended plaintiff have further neurological work up and an MRI to rule out a cervical disc herniation, as well as a CAT scan to rule out chronic subdural hematoma. Dr. Wood diagnosed plaintiff with Chronic Cephalgia since January 1999, cervical neck pain with radiculopathy, memory loss and confusion that could be secondary to a chronic subdural hematoma.
15. Plaintiff underwent a Physical RFC assessment on January 22, 2003 that was contained in the stipulated Social Security file and indicated his physical limitations to be no lifting more than 50 pounds occasionally and 25 pounds frequently.
16. On January 16, 2003 and February 10, 2003, plaintiff underwent a consultative psychological exam by Dr. Michael Zande and Nancy H. Moss, M.S. The exam revealed motor activity was restless and plaintiff had suicidal ideation. The Wechsler Adult Intelligence Scale III revealed plaintiff to have a verbal IQ score of 51, a performance IQ score of 48 and a full-scale IQ score of 45 that demonstrates mental retardation. Dr. Zande indicated plaintiff suffered from a Major Depressive Disorder and pain disorder stemming from the January 1999 injury on the job. Dr. Zande opined it was unlikely plaintiff will be able to return to work within the next year even if he receives appropriate mental health and medical treatments.
17. At defendant's request, plaintiff underwent an independent medical evaluation by Dr. Barton Williams on November 9, 2003. This is the most recent medical evaluation of plaintiff. His mother accompanied plaintiff to this appointment. As part of his evaluation, Dr. Williams requested plaintiff undergo an MRI of his brain based on complaints of memory loss, headaches, and eye twitching. The MRI, which was performed on December 3, 2003, was negative. Based upon plaintiff's physical examination, an interview with plaintiff and his mother, along with Dr. William's observation of plaintiff and his mother when they left his office, Dr. Williams was of the opinion that plaintiff's symptoms were not consistent with the mechanism of injury described as occurring in 1999 and did not have any medical basis whatsoever. For example, Dr. Williams found plaintiff's claims regarding an injury to his right wrist to be unsupported by the physical findings upon examination. Plaintiff and his mother claimed that plaintiff had been forced to wear a wrist brace on his right wrist/hand as a result of the 1999 incident. Yet, if this had been true and plaintiff had been limited in the use of his right hand for those four years, there would have been a wasting of the muscle tissue/atrophy and there was not. Dr. Williams also found that plaintiff's facial twitching was not the result of any injury. He noted that when plaintiff thought no one was looking at him, he had no facial twitching. Dr. Williams found the same to be true of the twitching when plaintiff was distracted. Dr. Williams found that in addition to his complaints concerning his right hand, plaintiff also demonstrated multiple inconsistencies with regard to his orthopedic injuries including having four of five positive Waddell's signs. In addition, Dr. Williams also found that plaintiff's mother was not a credible historian. He specifically noted that the mother claimed plaintiff's mental function was that of a small child who had to have constant monitoring including so that he would not wander into the street and get hit by a car. Yet, as Dr. Williams noted, when plaintiff and his mother left the examination, it was plaintiff who got in the driver's side of the car and drove away. The findings of Dr. Williams are deemed credible.
18. On January 7, 2004, the parties attended a Mediated Settlement Conference ("MSC"). As a result of the conference, the parties reached a settlement of plaintiff's workers' compensation claim. The parties executed a Mediated Settlement Agreement (the "Agreement"). The terms of the Agreement specify that plaintiff would execute a compromise settlement agreement ("CSA") and general release in exchange for payment of $10,000.00, and payment of related unpaid medical expenses not to exceed $1,200.00, and the entire mediator's fee. Per the Agreement, $1,000.00 of the CSA was to be advanced to plaintiff upon his execution of the CSA. Plaintiff, plaintiff's counsel, a representative of defendant-employer, and defense counsel signed the CSA.
19. At the April 19, 2005 hearing, plaintiff testified that he intended to resolve his claim and that he wanted to resolve his claim at the time of the MSC. Plaintiff further testified that he learned on or about January 8, 2004, that the Social Security Administration had approved his claim for Social Security disability benefits retroactive to March 1999, and that he refused to execute the CSA because he felt that the Social Security determination bolstered his workers' compensation claim.
20. In view of the amount of the settlement in this case, a Medicare set aside is not required. Additionally, the undersigned are of the opinion that the "mutual mistake" analysis is not applicable here. The record demonstrated that throughout this case, plaintiff has asserted his disability. Thus, the Social Security Administration ruling of January 8, 2004, did not establish that plaintiff was mistaken about his condition. To the contrary, the ruling supported plaintiff's belief.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident on January 30, 1999. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff did not sustain a compensable period of disability, and defendants properly paid medical compensation without prejudice to later deny plaintiff's claim. N.C. Gen. Stat. §§ 97-2(9), 97-28, Harrington v. Adams-RobinsonEnterprises, 349 N.C. 218, 504 S.E.2d 786 (1998); N.C. Gen. Stat. § 97-25, Biddix v. Rex Mills, Inc., 237 N.C. 660,75 S.E.2d 777 (1953); Harrison v. Lucent Technologies,156 N.C.App. 147, 575 S.E.2d 825 (2003).
3. Plaintiff has failed to prove that he requires further medical compensation as the result of his compensable injury. N.C. Gen. Stat. § 97-25; Holley v. ACTS, Inc., 357 N.C. 228,581 S.E.2d 750 (2003).
4. The Agreement is enforceable between the parties, and it requires plaintiff to execute a compromise settlement agreement.Lee v. Wake County, 165 N.C. App. 154, 598 S.E.2d 427; disc.review denied, 359 N.C. 190, 607 S.E.2d 275 (2004).
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Plaintiff's claim for disability and medical compensation is hereby DENIED.
2. Plaintiff is hereby ORDERED to execute a CSA in satisfaction of the terms of the January 7, 2004 Agreement. Once executed by both parties, the CSA is to be submitted to the undersigned for review pursuant to N.C. Gen. Stat. § 97-17 and Rule 502 of the North Carolina Industrial Commission's Workers' Compensation Rules.
3. Defendant shall pay costs.
This the __ day of May, 2006.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER